## MARYLAND CASUALTY CO. v. LANDRY.

### No. 3468.

Court of Civil Appeals of Texas. Beaumont.

May 11, 1939.

Rehearing Denied June 7, 1939.

756

Smith, Smith & Boyd, of Beaumont, for appellant.

Xavier Christ, of Pt. Arthur, and B. C. Johnson, of Houston, for appellee.

WALKER, Chief Justice.

This case was filed in the lower court by appellant, Maryland Casualty Company, the compensation insurance carrier, as an appeal from the adverse award of the Industrial Accident Board in favor of appellee, Wilson Landry, the employee; The Texas Can Company of Port Arthur, Texas, was the employer. The jury found the following facts: On the 13th day of October, 1936, while in the course of his employment with The Texas Can Company, appellee, Wilson Landry, suffered an accidental injury which resulted in a permanent, total disability; the injury was "not due solely to cause or causes wholly independent of the injury," received by appellee on the 13th day of October, 1936; nor was the injury "limited to his right forearm." It was further found that appellee had not, and would not in the future, "as a result of his injury * * * suffer any partial disability"; all other issues of partial disability were found in appellee's favor. As fair to both parties, appellee's average weekly wage was fixed at $25 per week, and facts were found entitling him to a lump-sum settlement. Appellee was injured on the 13th day of October, 1936, but his claim was not filed with the Industrial Board until the 12th day of May, 1937; the jury found that appellee had "good cause," excusing the delay in filing the claim. Judgment was rendered in favor of appellee on the jury's verdict, from which appellant has duly prosecuted its appeal to this court.

We overrule appellant's contentions that appellee's injury was specific and not general; that it was limited to his right forearm; that the disability suffered by him as a result of his injury was specific and limited to his right forearm; that the jury's finding of total, permanent disability was without support in the evidence, and against the overwhelming weight and preponderance of the evidence; that the evidence did not raise the issue of "permanent disability," and that the jury's finding of permanent disability was without support in the evidence, and against the overwhelming weight and preponderance of the evidence. The evidence raised the following issues in support of the jury's verdict: On the 13th day of October, 1936, while in the course of his employment with The Texas Can Company, and while discharging the duties of his employment, appellee broke a bone in his right hand. This injury has not healed, and under the evidence of expert physicians it will never heal, and as a proximate result of his injury appellee has suffered a total, permanent disability to labor. The evidence raised the issue that the disability was not specific, and that the injury was not confined to appellee's right forearm. His arm pained him; the pain extended from his arm up into his neck; two or three times a week he suffered attacks of pain that disabled him from all physical activities; he had to take rest medicine, and his family had to treat him with hot bandages and resort to other remedies to relieve his pain. We quote from the testimony of Dr. I. T. Young, describing appellee's physical condition resulting from the broken bone in his hand:

"Q. Now, Doctor, with reference to his fingers and his ability to use his fingers, what, if anything, was the condition at that time, as you remember? A. Well, he had very little grip in his hand. He had no strength, and it hurt him when he closed it, and you understand he suffered with pain when he closed his hand. He had very little grip in his hand.

"Q. Doctor, at that time I will ask you if you told him what to do to relieve the pain, or did he tell you what he had been doing? Just tell us as near as you can. A. Well, rest is about the only way to relieve that pain, to put the hand at rest, you understand, and very often we have to give them something to relieve the pain.

"Q. Now, Doctor, from what you saw and what you ascertained in your examination of him there, did you or not attribute that break to a traumatic injury? Traumatism I believe you doctors call it.

A. Well, we certainly think of that; certainly, we did.

"Q. I will as you, Doctor, if that sort of break, if—I will put it this way—I withdraw that and put it in this shape—if a person came to you with that sort of break, but you didn't know it was broken that way, in trying to diagnose that sort of thing if in the absence of a history of an injury—trying to diagnose—until you get an X-ray diagnosis, diagnose it as neuritis running up in the shoulder and back of the head? A. Yes, you can mistake it for neuritis, but—Mr. Boyd: Let him finish.

"Q. I will ask you if the existence of that pain, that existing pain that you often mistake for neuritis is not a result of a break, affecting the tendons and nerves of the wrist? A. Of course, the swelling in the wrist, we naturally think of some local condition around the wrist, because he had swelling there, and his pain started in his wrist and run up in his arm. You would naturally look for some local condition causing this trouble. That is why I sent him to the X-ray man.

"Q. I will ask you if continual suffering from pain doesn't affect the entire nervous system. A. It does to a certain extent, yes, sir.

"Q. Doctor, have you examined him since that first time on numerous occasions? A. I saw him a few times after that.

"Q. Can you give us an idea as to the number of times? A. Oh, I guess I must have seen him eight or ten times at different intervals.

"Q. Eight or ten times. Could you see any improvement or anything of that kind, Doctor? A. No improvement at all.

"Q. Now I will ask you, Doctor, if even this year or about January, if you undertook to study his case and do something for him. A. It was some time in February. I applied a cast to his hand in February and left it there about six weeks.

"Q. At that time, I will ask you to tell the jury what you found with reference to the condition of his fingers and his hand, etc. A. Well, his fingers and wrist was dropped like this and his fingers were pulled down like this. He complained of quite a bit of pain and I did not feel like I was able to relax his hand like it should be, and so I gave him an anaesthetic. I put him to sleep and straightened his hand and put a cast on it so it would hold straight, and I left it there about six weeks, trying to relieve that pulling sensation, you understand, or correct the position of his fingers. I did that, yes, sir.

"Q. Doctor, I will ask you if during that time you had him to report to you either over the 'phone or in person? A. He dropped in once in a while. He dropped in and told me how he was getting along.

"Q. I will ask you, Doctor, if you had any luck or what was the ultimate result when you took the cast off? A. Well, after we got his fingers set and got over all that pulling sensation temporarily, he seemed to have gotten a little relief, but when I took the cast off it went back down in about the same position.

"Q. Just about the same position? A. In a few days it dropped back in the same position again.

"Q. I don't know whether I asked you or not, but I will ask you—I believe I asked you if it would not be natural for it to go back in that position. A. Yes, sir.

"Q. Doctor, from your experience as a physician and surgeon and your examination of Mr. Landry and all you know about the case, I will ask you whether or not in your opinion that condition is permanent. A. It is permanent.

"Mr. Boyd: I object to that because it is based, in part, on hearsay testimony.

"The Court: Objection overruled.

"Mr. Boyd: Note our exception.

"The Court: I believe he testified he treated him.

"Q. Now, Doctor—

"The Court: Did he answer the question?

"Mr. Johnson: He said it was permanent.

"Q. Doctor, I will ask you if the condition that exists there is conducive to pain. In other words, would you naturally expect pain in that sort of condition? A. Yes, he has pain. We would expect it.

"Q. In your opinion, would that pain be such as to preclude a man from obtaining and retaining employment as a physical laborer? A. I think it would."

The evidence in this case brings appellee's claim for compensation within the rule announced by this court in Lumbermen's Reciprocal Ass'n v. Anders, 292 S. W. 265, 268; we quote as follows: "Here the jury has found that the injury to ap-

758

pellee has totally and permanently incapacitated him for work, not because he has lost the use of his foot only, but because the conditions that have grown out of his injury are such that he cannot perform manual labor of any character, and we think that the evidence was clearly sufficient to sustain that finding. We therefore overrule appellant's contention that the verdict and judgment in this case are erroneous' because appellee was not confined to a recovery of compensation for only a period of 125 weeks." See, also, Miller's Indemnity Underwriters v. Cahal, Tex.Civ.App., 257 S.W. 957.

■ On the nature, extent, and permanency of appellee's disability, appellant prepared and requested the court to submit the following questions to the jury: (1) Has appellee "fully recovered from any disability sustained by him as a result of his alleged injury?" (2) "Is appellee able to perform the same character of work he was performing prior to the time he received the personal injury, if any, on October 13, 1936?" (3) "Is appellee's permanent incapacity to labor the result of the injury, if any, to his right arm?" These issues were raised by the evidence, and under appellant's general denial were available to it as defenses against appellee's cause of action. Though, in substance, they were involved in the court's submission of total, permanent disability and of partial disability, yet appellant had the right to an affirmative submission of these very defensive issues. 41 Tex.Jur. pages 1013–1014, "Trial"; Consolidated Underwriters v. Miller, Tex.Civ.App., 88 S.W.2d 573; Wright v. Traders & General Ins. Co., Tex.Com.App., 123 S.W.2d 314. Appellant's special defenses fall within the rule announced by the Supreme Court in Galveston, H. & S. A. Ry. Co. v. Washington, 94 Tex. 510, 63 S.W. 534, 538, where, discussing the issue of unavoidable accident, it was said that the jury "might have given effect to if it had been brought to their attention." See, also, on this point Treaccar' v. City of Galveston, Tex.Civ. App., 28 S.W.2d 276; Indemnity Ins. Co. v. Boland, Tex.Civ.App., 31 S.W.2d 518.

■ Appellee was a minor when he was injured, and did not attain his majority until several months after his claim was filed with the Industrial Accident Board. He had no legal guardian of his estate, and no one purported to act for him as "next friend." On these facts the minor-

ity of appellee, as a matter of law, constituted "good cause," as defined by Art. No. 8307, Sec. 4a, Revised Civil Statutes; on the issue of appellee's minority see Art. No. 8306, Sec. 3.

The other errors assigned need not be repeated on a new trial. The judgment of the lower court is reversed and the cause remanded.

Reversed and remanded.